Stephenson, J.
 

 Was the hearing of March 22,1933, as a matter of fact, a rate-making or a charge-fixing proceeding?
 

 If it was a rate-making proceeding, it was and is a nullity pure and simple, as the commission failed to comply with statutory requirements.
 

 If it was a charge-fixing proceeding, was it authorized by law, and if authorized by law was the city of Cleveland, under the facts and the law, entitled to be heard at the time and in the manner insisted upon by its counsel?
 

 Whether such proceeding was authorized by law or not, and whether the city of Cleveland had a right to be made a party, and heard, or not, did the Public Utilities Commission admit the city of Cleveland as a party? If it did so, the city of Cleveland is a party so far as the commission is concerned. Whether or not the city of Cleveland is a necessary party would have to be raised by one or both of the public utilities involved.
 

 The Public Utilities Commission of Ohio is the representative of the people of the state of Ohio. It is
 
 *436
 
 the intermediary between the citizen-consumer on the one side and the public utility on the other. It is a creature of statute, having only such power as the General Assembly has seen fit to confer upon it by statute. But all this does not mean that its powers are not broad, as will be readily seen by reference to the legislative grant of power. The delegation of power to the Public Utilities Commission has been lavish. It was necessary that it should be if the commission was to keep the public utilities within the limits of law and reason. It was the purpose of the creation of . the Public Utilities Commission that it should see to it that the public utilities, in accordance with law, rendered reasonably adequate service to their patrons without discrimination, at a just and reasonable cost, allowing at the same time to the public utilities rendering the service a fair profit on their investments. The cost for service comes to the consumer in the form of a rate, fare, charge, toll, rental, schedule, or tariff. The Public Utilities Commission has complete jurisdiction over every phase of cost to the consumer. Section 614-23, General Code.
 

 The General Assembly sensed a difference between a rate and a charge; else it would not have made such liberal use of the two words in the various sections whereby it bestows power upon the commission. These two words are of much import in these cases, as has been heretofore indicated.
 

 This court will not interfere with an order of the Public Utilities Commission unless such order is unlawful or unreasonable.
 
 Lima Telephone & Telegraph Co.
 
 v.
 
 Public Utilities
 
 Commission, 98 Ohio St., 110, 120 N. E., 330.
 

 Was the order of the commission, made April 21, 1933, unlawful?
 

 The commission on its own motion cited the Ohio Bell Telephone Company and the Cincinnati & Suburban Bell Telephone Company to appear before it on
 
 *437
 
 this date and disclose the cost to them of cradle type telephone instruments and-the cost of the installation thereof. There can be no question that the commission had the power to act
 
 sua sponte
 
 in such matter, and no question is raised along that line.
 

 The city of Cleveland was not a party to this proceeding, but it claims it should have been made a party as it was not only a proper but a necessary party to the determination of the issues before the commission.
 

 This contention could obtain only if the proceeding in question was a rate-making proceeding in fact.
 

 The tempest in these cases was generated by the additional cost of twenty-five cents per month to the subscriber for cradle telephone service. Was this twenty-five cents a rate or a charge?
 

 Of course it could be reduced to a rate, just as any rate could be reduced to a charge. In its finality is the extra cost to the consumer of cradle telephone service of twenty-five cents per month a rate or a charge, as contemplated by the laws of Ohio?
 

 It may be argued with much potency that it is a dangerous precedent to permit a public utility to go over the head of the Public Utilities Commission and enter into private contracts with its patrons. It may likewise be insisted that neither this nor any other court should by judicial legislation convert a rate into a charge or a charge into a rate.
 

 It may not be ill-timed to state that we are dealing with the terms involved in these cases just as we find them in the legislative enactments of the state.
 

 It is likewise impolitic to deny to a citizen of the state the right to an improved service, when such citizen voluntarily agrees to pay the increased cost.
 

 The converse of this proposition was recognized by this court in the case of
 
 City of Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 113 Ohio St., 259, 148 N. E., 817. The law as pronounced in the fourth paragraph of the syllabus is as follows:
 

 
 *438
 

 “A
 
 classified service schedule requiring the payment of toll charges for communications between unlimited subscribers contracting for service at a higher rate and limited subscribers contracting for optional service at a lesser cost, each residing in different zone areas, is reasonable, lawful and not discriminatory.”
 

 The case above referred to arose by reason of objections to the
 
 “charges”
 
 contained in a telephone company’s
 
 “schedule.”
 

 A
 
 telephone company is permitted under the law to indulge a schedule or tariff in which different cost for different service is listed. This is true of other public utilities. As a matter of law, those public utilities which, by reason of the nature of their business, afford different service or the same service in different Avays, are required to file -with the Public Utilities Commission a schedule of charges. There is an obvious reason for this requirement. Rate-making involves a long, arduous, complex, expensive proceeding, and according to a “legislative formula,” as was held in
 
 Columbus Gas & Fuel Co.
 
 v.
 
 Public Utilities Commission and City of Columbus
 
 v.
 
 Public Utilities Commission, ante,
 
 109, 187 N. E., 7.
 

 To require a new rate to be made each and every time a new item of cost to the consumer arises, as in the present cases, would not only create such a volume of work as would smother the Public Utilities Commission, but would bankrupt the public utilities, who, in the main, must finance these proceedings. That it will be necessary to take into consideration the advent of the hand or cradle set the next time a rate is made for these companies goes Avithout saying.
 

 In order to minimize the expenditure of time and cost incident to rate proceedings, and take care of the consumer at the same time, the General Assembly enacted Section 614-17, General Code:
 

 “Nothing in this act shall be taken to prohibit a public utility from filing a schedule or entering into
 
 *439
 
 any reasonable arrangement -with another public utility or with its customers, consumers or employes for the division or distribution of its surplus profits or providing for a sliding scale of charges, including variations in rates based upon stipulated variations in cost as provided in the schedule or arrangement, or providing for a minimum charge for service to be rendered unless such minimum charge is made or prohibited by the terms of the franchise, grant or ordinance under which such public utility is operated, or providing for a classification of service based upon the quantity used, the time when used, the purpose for which used, the duration of use, and any other reasonable consideration, or providing any other financial device that may be practicable or advantageous to the parties interested. No such arrangement, sliding scale, minimum charge, classification, variable rate or device shall be lawful unless the same shall be filed with and approved by the commission. Every such public utility is required to conform its schedules of rates, tolls, and charges to such arrangement, sliding scale, classification or other device, and where variable rates are provided for in any such schedule or arrangement, the cost data or factors upon which such rates are based and fixed shall be filed with the commission in such form and at such times as the commission shall determine and direct.
 

 “Every such arrangement, sliding scale, Tninimum charge, classification, variable rate or device shall be under the supervision and regulation of the commission, and subject to change, alteration or modification by the commission.”
 

 The liberality of this section of the General Code may subject it to criticism, but, as the Christian says of the Bible, “It is in the book.”
 

 The classification of service in a schedule is dependent upon quantity used, time when used, the purpose for which used, the duration of use, and other
 
 *440
 
 reasonable considerations which essentially distinguish the service required to meet the various demands.
 
 The Cleveland & Eastern Traction Co.
 
 v.
 
 Public Utilities Commission,
 
 106 Ohio St., 210, 140 N. E., 139.
 

 The item of expense to a public utility incident to furnishing a service is a determining factor in ascertaining whether or not a rate is lawful and reasonable.
 
 Shaw-Fahrer Grain Co.
 
 v.
 
 Public Utilities Commission,
 
 126 Ohio St., 74, 183 N. E., 922.
 

 It must be held that the procedure followed by the Public Utilities Commission in these cases was not unlawful, in so far as the citation and hearing were concerned.
 

 Did the commission violate the law in its attitude toward the city of Cleveland?
 

 We cannot consider Section 614-43, General Code, seriously in connection with these cases, as that section, we take it, must be read in connection with Section 614-42, General Code. When so read, it is plainly discernible that these sections deal with railroads exclusively.
 

 Does Section 543, General Code, afford the city of Cleveland any relief in these cases?
 

 It seems that, in the past, courts and counsel have, in a manner, herded these two sections together in an effort to give them a strained construction which they will not bear, to the end that a hearing or rehearing, as the case may be, before the Public Utilities Commission, is a “free-for-all” in which every one, regardless of interest, is entitled to be heard. If such were the law, it would be bad law, as it would run counter to the fundamental rule to the effect that “He who has no interest in the subject of litigation has no right to be heard.” Such a departure from the established rules of procedure could result in nothing less than bedlam. But such is not the law. In support of this declaration, we quote the first, third and fourth sentences of Section 543, General Code:
 

 
 *441
 
 “After any order or decision has been made by the commission, any party to the action or proceeding, or any stockholder or bondholder or other
 
 party pecuniarily interested in the public utility affected,
 
 may apply for a rehearing in respect to any matters determined in said action or proceeding and specified in the application for rehearing, and the commission may grant and hold such rehearing on said matters, if
 
 in its judgment
 
 sufficient reason therefor be made to appear. * * *• Such application shall set forth specifically the ground or grounds on which the applicant considers said decision or order to be unreasonable or unlawful. No corporation or person shall in any court urge or rely on any ground not so set forth in said application.”
 

 It is not necessary to expatiate on the construction of this statute, as it automatically construes itself.
 

 In order to get a true picture of these cases, we indulge a further statement of fact as developed by the record.
 

 In 1926 hand set telephones were made optionally available to subscribers in Ohio by the telephone companies involved herein. It will be noted that the terms “hand set” and “cradle set” mean one and the same thing and are used interchangeably herein to distinguish the new type telephone instrument from the old type known as the “desk set.”
 

 The quality of service rendered by the hand set telephones inaugurated in 1926 was inferior, and in April of 1927 they were discontinued. Their use was not resumed until February, 1928, when such resumption was occasioned by the demand for the cradle type telephone and the request of the Public Utilities Commission of Ohio to the Ohio Bell Telephone Company to resume furnishing the same as a special assemblage of equipment under its general exchange tariff.
 

 While the hand or cradle set has become increas
 
 *442
 
 ingly popular, the desk set is still the standard equipment of the telephone companies.
 

 The hand or cradle set is a special unit assemblage of equipment, and is a much more expensive instrument than the desk set. The hand or cradle set is furnished at a cost to the companies of $9.20 as against a cost of $4.84 for the desk set.
 

 These companies have several million dollars invested in desk set equipment. The desk sets will be available for many years, and the displacement of desk sets by hand or cradle sets necessarily occasions a considerable loss in usable equipment to the telephone companies. These telephone companies incurred increased expense in the installation, operation and maintenance of the hand or cradle sets.
 

 These additional facts are stated from the record, not only as a sort of general resumé, but for the purpose of making it manifest that the telephone companies did not impose the hand or cradle set instruments on their subscribers.
 

 The subscriber has at all times had the right to exercise his option as to whether he would use the desk or cradle type instrument. If the subscriber engaged the cradle set, he was made to know that it would cost him twenty-five cents per month extra. The trouble came about, and properly so, because the subscriber did riot know just how long he would be required to continue to pay the extra charge of twenty-five cents per month. This was the fault of the telephone companies, as they should have known that the consuming public and the Public Utilities Commission, one or both, in a time of financial stress, would not permit them to unduly enrich themselves by means of a new device, even if such device was furnished in response
 
 to
 
 public demand.
 

 The telephone companies knew what they were entitled to charge under the law for the hand or cradle set, and did not put the subscriber in possession of the
 
 *443
 
 information he was entitled to have. The contention of the telephone companies that they intended that the fixed charge of twenty-five cents per month for the hand or cradle set should terminate after five years, in view of the record in this case, availed the subscriber nothing, as he had no means of knowing what the companies intended.
 

 The five-year charge would not only have given them an amount sufficient to amortize both types of telephone, but would have allowed them ninety-six cents on increased cost of installation, operation, and maintenance.
 

 This court has heretofore held that the laws of Ohio do not recognize amortization as such in arriving at a rate base. It was right for the commission to make a proper allowance for increased cost of installation, operation and maintenance, and a proper allowance for the obsolescence for such of the desk type instruments as would necessarily be discarded, the number of which could only be approximated, but the item of obsolescence for the hand, or cradle telephone would have to be taken care of as such instruments became obsolete.
 

 In view of the record in this case, we are unable to see wherein the order of the Public Utilities Commission was unlawful or unreasonable. The city of Cleveland was not a party to the original hearing, and, as this proceeding was the fixing of a charge item in a tariff or schedule, held by authority of a citation issued to the telephone companies in question by the Public Utilities Commission on its own motion, it had no legal status on its application for rehearing in a matter to which it was not a necessary party to the final determination of the issues. If it had been a necessary party, its proffer fell far short of the requirements even when presented to a
 
 quasi
 
 judicial body where the strict rules of procedure are necessarily relaxed. The making of a new party to a pro
 
 *444
 
 ceeding must be evidenced by the record. We fail to find any record that forecloses the commission to now insist that the city of Cleveland is not and never was a party in fact to this proceeding..
 

 The flat finding to the effect that the city of Cleveland was not a necessary party to these proceedings is probably dispositive of these cases, but it would decide none of the worth-while questions.
 

 Finding that the city of Cleveland was not a party, it was necessary to determine whether or not, under all the facts and circumstances, the commission should have made-it a party and whether or not its refusal so to do tainted the order made April 21,1933. In determining this question, we have considered and passed upon the merits of the case.
 

 We find no prejudicial error in the proceedings of the Public Utilities Commission, and we further find that the 'order in question was not unlawful or unreasonable.
 

 Order affirmed.
 

 Weygandt, C. J., Allen, Jones, Matthias, Bevis and Zimmerman, JJ., concur.