[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Determination of Existence of Significantly Excessive Earnings for 2017 Under the Elec. Sec. Plan of Ohio Edison Co.*, Slip Opinion No. 2020-Ohio-5450.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5450

IN RE DETERMINATION OF EXISTENCE OF SIGNIFICANTLY EXCESSIVE EARNINGS FOR 2017 UNDER ELECTRIC SECURITY PLAN OF OHIO EDISON COMPANY; OFFICE OF OHIO CONSUMERS' COUNSEL, APPELLANT; PUBLIC UTILITIES COMMISSION, APPELLEE; OHIO EDISON COMPANY, INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re Determination of Existence of Significantly Excessive Earnings for 2017 Under the Elec. Sec. Plan of Ohio Edison Co.*, Slip Opinion No. 2020-Ohio-5450.]

*Public Utilities—R.C. 4928.143(F)—Public Utilities Commission should not have excluded the revenue from Ohio Edison Company's Distribution Modernization Rider in its annual earnings review of Ohio Edison's electric security plan—Cause remanded to the commission.*

(No. 2019-0961—Submitted May 12, 2020—Decided December 1, 2020.)

APPEAL from the Public Utilities Commission, No. 18-0857-EL-UNC.

_____

**STEWART, J.**

{¶ 1} R.C. 4928.141(A) requires electric-distribution utilities to make a "standard service offer" of generation service to consumers in one of two ways: through a "market rate offer" (under R.C. 4928.142) or an "electric security plan" (under R.C. 4928.143). Electric-distribution utilities that opt to provide service under an electric security plan must undergo an annual earnings review by appellee, the Public Utilities Commission. R.C. 4928.143(F). If the commission finds that the plan resulted in "significantly excessive earnings" compared to similar companies, the utility must return the excess to its customers. *Id.*

{¶ 2} In this case, the commission found that intervening appellee Ohio Edison Company's 2017 earnings were not significantly excessive.

{¶ 3} Appellant, the Office of the Ohio Consumers' Counsel ("OCC"), appeals from the orders making that finding, challenging the commission's decision to exclude revenue resulting from Ohio Edison's Distribution Modernization Rider ("DMR") from the earnings test. We conclude that the commission's decision to exclude revenue resulting from the DMR, which was approved as part of the company's electric security plan, was not reasonable. Accordingly, we reverse the commission's orders and remand the cause for further proceedings.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 4} On March 31, 2016, the commission approved the fourth electric security plan ("ESP") of the FirstEnergy companies, which includes Ohio Edison. The plan runs for eight years, ending on May 31, 2024. *In re Application of Ohio Edison Co.*, Pub. Util. Comm. No. 14-1297-EL-SSO, 2016 Ohio PUC LEXIS 270 at *33 (Mar. 31, 2016) ("ESP Case"). As part of the ESP, the commission authorized the DMR, which was intended to serve as an incentive for the companies to modernize their distribution systems. Pub. Util. Comm. No. 14-1297-EL-SSO, 2016 Ohio PUC LEXIS 920, Fifth Entry on Rehearing, ¶ 185-213 (Oct. 12, 2016) ("ESP Fifth Entry on Rehearing").

{¶ 5} R.C. 4928.143(F)[1] requires the commission to consider annually whether the electric security plan resulted in "significantly excessive earnings" compared to companies facing "comparable" risk:

> With regard to the provisions that are included in an electric security plan under this section, the commission shall consider, following the end of each annual period of the plan, if any such adjustments resulted in excessive earnings as measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate. Consideration also shall be given to the capital requirements of future committed investments in this state.

The utility bears the "burden of proof for demonstrating that significantly excessive earnings did not occur," and if the commission finds that "such adjustments"—referring to provisions of the electric security plan—"in the aggregate, did result in significantly excessive earnings, it shall require the electric distribution utility to return to consumers the amount of the excess by prospective adjustments." *Id*.

{¶ 6} On May 15, 2018, FirstEnergy filed an application with the commission to conduct the significantly-excessive-earnings test ("SEET") for each of its companies for 2017 (the "SEET case"). FirstEnergy and the commission's staff argued that DMR revenue should be excluded from the SEET calculation for 2017, consistent with the commission's determination of this issue in the ESP case.

---

1. We apply the version of R.C. 4928.143(F) as amended by 2011 Am.Sub.H.B. No. 364 because that is the version that was in effect when the SEET application was filed on May 15, 2018.

OCC challenged the exclusion of Ohio Edison's DMR revenue, arguing that R.C. 4928.143(F) does not permit the commission to exclude revenue collected directly from charges approved under the plan.

{¶ 7} The commission held that revenue that Ohio Edison had collected under the DMR in 2017 should be excluded from the SEET review because that was the methodology approved in the ESP case. Pub. Util. Comm. No. 18-0857-EL-UNC, 2019 Ohio PUC LEXIS 330, at ¶ 26 (Mar. 20, 2019) ("SEET Order"), citing ESP Fifth Entry on Rehearing, 2016 Ohio PUC LEXIS 920, at ¶ 212 and Pub. Util. Comm. No. 14-1297-EL-SSO, 2017 OHIO PUC LEXIS 719, Eighth Entry on Rehearing, ¶ 81 (Aug. 16, 2017) ("ESP Eighth Entry on Rehearing"). In the ESP proceedings, the commission found that "DMR revenues should be excluded from SEET calculations," at least during the initial three-year period of the DMR, because including that revenue "would introduce an unnecessary element of risk to [Ohio Edison] and undermine the purpose of providing credit support for the Compan[y]." ESP Fifth Entry on Rehearing at ¶ 212. The commission affirmed this ruling in the ESP Eighth Entry on Rehearing and also found that the arguments against excluding the DMR revenue from the 2017 SEET were premature. *Id.* at ¶ 81.

{¶ 8} OCC filed an application for rehearing in the SEET case, arguing that the commission violated R.C. 4928.143(F) when it excluded DMR revenue from the 2017 SEET. The commission denied rehearing on May 15, 2019.

{¶ 9} One month later, on June 19, 2019, we held that the DMR was unlawful and ordered it removed from the ESP. *In re Application of Ohio Edison Co.*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906. We declined to rule on whether the commission erred in excluding DMR revenue from the SEET, finding that the issue could be raised in the annual SEET review. *Id.* at ¶ 33-34.

{¶ 10} On July 15, 2019, OCC filed this appeal, challenging the commission's decision to exclude the DMR revenue from the SEET.

4

## II. STANDARD OF REVIEW

{¶ 11} "R.C. 4903.13 provides that a [Public Utilities Commission] order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not reverse or modify a commission decision as to questions of fact when the record contains sufficient probative evidence to show that the commission's decision is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29. The appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record. *Id.*

{¶ 12} Although this court has "complete and independent power of review as to all questions of law" in appeals from the Public Utilities Commission, *Ohio Edison Co. v. Pub. Util. Comm.*, 78 Ohio St.3d 466, 469, 678 N.E.2d 922 (1997), we may rely on the expertise of a state agency in interpreting a law when "highly specialized issues" are involved and when "agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly," *Consumers' Counsel v. Pub. Util. Comm.*, 58 Ohio St.2d 108, 110, 388 N.E.2d 1370 (1979).

## III. ANALYSIS

{¶ 13} OCC argues that the commission acted unreasonably and unlawfully when it excluded the DMR revenue from the annual SEET review. According to OCC, R.C. 4928.143(F) does not support the commission's decision to remove that revenue from the calculation of Ohio Edison's earned return on common equity.

OCC also asserts that the commission's decision is contrary to this court's prior interpretation of that provision.

**A. This court will defer to the commission's interpretation of R.C. 4928.143(F), but only if it is reasonable**

{¶ 14} While we generally review questions of law de novo, we will defer to the commission's interpretation of a statute when "there exists disparate competence between the respective tribunals in dealing with highly specialized issues." *Consumers' Counsel* at 110. "One area in which this court has consistently deferred to the expertise of the commission is in determining rate-of-return matters." *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, 147 Ohio St.3d 59, 2016-Ohio-1607, 60 N.E.3d 1221, ¶ 41, citing *Ohio Edison Co. v. Pub. Util. Comm.*, 63 Ohio St.3d 555, 561, 589 N.E.2d 1292 (1992), fn. 3. "Limited judicial review of a rate of return determination is sound" because " 'cost of capital analyses * * * are fraught with judgments and assumptions.' " (Ellipsis sic.) *Consumers' Counsel v. Pub. Util. Comm.*, 64 Ohio St.2d 71, 79, 413 N.E.2d 799 (1980), quoting *Dayton Power & Light Co.*, Pub. Util. Comm. No. 78-92-EL-AIR, at 26 (Mar. 9, 1979).

{¶ 15} In 2012, we held that R.C. 4928.143(F) is essentially a rate-of-return statute and therefore it is appropriate to review the commission's interpretation of R.C. 4928.143(F) deferentially. *In re Application of Columbus S. Power Co.*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, ¶ 36-38. Nevertheless, we defer to the commission's interpretation of R.C. 4928.143(F) only if it is reasonable. *Id.* at ¶ 38.

{¶ 16} In this case, the commission's interpretation of R.C. 4928.143(F)— that it allows exclusion of DMR revenue from the SEET—is not reasonable.

*1. The commission's orders cite no language in R.C. 4928.143(F) that justifies excluding DMR revenue from the SEET*

{¶ 17} Whether an ESP "resulted in excessive earnings" must be

measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate.

R.C. 4928.143(F).

{¶ 18} In the SEET proceeding, the commission ruled that excluding DMR revenue from the annual earnings review was appropriate because that was the methodology that the commission had approved in Ohio Edison's fourth ESP case. The commission's analysis of this issue is contained in the ESP Fifth Entry on Rehearing:

[T]he Commission finds that Rider DMR[2] revenues should be excluded from SEET calculations. Including the revenue in SEET would introduce an unnecessary element of risk to the Companies and undermine the purpose of providing credit support for the Companies. However, we will reconsider whether to exclude Rider DMR revenues from SEET when we rule upon any possible extension of Rider DMR.[3]

---

2. "Rider DMR" stands for "Rider Distribution Modernization Rider." We use "DMR" to avoid redundancy; however, both terms refer to the same rider.

3. The commission approved the DMR for only three years, but the FirstEnergy companies had the option of filing an application to extend the rider for two more years. ESP Fifth Entry on Rehearing at ¶ 210.

*Id.*, 2016 Ohio PUC LEXIS 920, at ¶ 212.

{¶ 19} The commission affirmed this ruling in the ESP Eighth Entry on Rehearing but added little to its analysis:

> The commission affirms our ruling that the revenue collected under Rider DMR should be excluded from SEET for the initial three-year period. At the time we issued the Fifth Entry on Rehearing, we found the arguments made by the Companies to be persuasive and continue to do so today, to the extent such arguments are relating to the initial three-year period of Rider DMR. Intervenors have raised no new arguments for our consideration, and we fully considered those arguments in the Fifth Entry on Rehearing. * * * Moreover, intervenors' arguments raise hypothetical concerns in any event and, thus, are also premature. Accordingly, we find that rehearing on these assignments of error should be denied.

*Id.,* 2017 OHIO PUC LEXIS 719, at ¶ 81.

{¶ 20} The commission is a creature of statute and may act only under the authority conferred on it by the General Assembly. *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 88, 706 N.E.2d 1255 (1999). The commission's justification for excluding the DMR was that including its revenue "would introduce an unnecessary element of risk to the Companies and undermine the [DMR's] purpose of providing credit support." ESP Fifth Entry on Rehearing at ¶ 212. But the commission failed to even cite R.C. 4928.143(F), let alone explain how that provision allows the commission to exclude DMR revenue on this basis. We recently held that the

commission's failure to cite specific statutory authority for its actions is grounds for reversal. *In re Application of Ohio Edison Co.*, 158 Ohio St.3d 27, 2019-Ohio-4196, 139 N.E.3d 875, ¶ 15-17 ("we decline to assume that the General Assembly implicitly granted authority to the commission * * * without any clear indication in the statutory language to that effect").

{¶ 21} The commission's finding that Ohio Edison would face "an unnecessary element of risk" if DMR revenue were included, ESP Fifth Entry on Rehearing, 2016 Ohio PUC LEXIS 920, at ¶ 212, does not provide the necessary support. In making that finding, the commission appears to have accepted Ohio Edison's claim that including the revenue in the SEET calculation would defeat the DMR's purpose of supporting future grid-modernization projects by increasing the risk to the company of having to refund that revenue. *See id.* at ¶ 181 (setting forth Ohio Edison's argument and citing an exhibit submitted by Ohio Edison). But electric utilities face the risk of a refund in *every* SEET case. *See* R.C. 4928.143(F) (if the commission finds that the ESP resulted in excessive earnings, "it shall require the electric distribution utility to return to customers the amount of the excess"). The commission's removal of revenue from the SEET without statutory authorization and without an appropriate rationale completely undermines the purpose of the test.

### 2. The commission's orders are contrary to precedent

{¶ 22} OCC also argues that the commission's decision is contrary to our interpretation of R.C. 4928.143(F) in *Columbus S. Power*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276. We agree.

{¶ 23} In *Columbus S. Power*, we considered the commission's ability to exclude certain revenue from the utility's earnings *before* determining whether the utility's earnings were significantly excessive. The commission had excluded from the utility's earnings certain revenue from off-system sales—wholesale sales by the

utility to nonretail customers. *Id.* at ¶ 7-8, 35. We analyzed the following language contained in the first sentence of R.C. 4928.143(F):

> With regard to the provisions that are included in an electric security plan under this section, the commission shall consider, following the end of each annual period of the plan, if any such adjustments resulted in excessive earnings * * *.

{¶ 24} We explained that this language requires the commission to determine whether "such adjustments"—referring to provisions of the ESP—resulted in excessive earnings. *Columbus S. Power* at ¶ 40. And we concluded that, by implication, earnings *not caused by* the ESP may be excluded from consideration. We therefore held that the commission's interpretation of R.C. 4928.143(F)—that it allows exclusion of revenue *not* resulting from the ESP—was reasonable. *Columbus S. Power* at ¶ 39-40.

{¶ 25} OCC maintains that the DMR is a provision of the ESP and constitutes an "adjustment" under R.C. 4928.143(F). OCC therefore contends that under *Columbus S. Power*, the commission was required to consider whether the DMR—as an adjustment to the ESP—resulted in excessive earnings.

{¶ 26} OCC is correct. To be sure, we did not directly decide in *Columbus S. Power* whether earnings *caused by* the ESP may be excluded from consideration before determining whether the utility's earnings were significantly excessive. But we did say that R.C. 4928.143(F) requires the commission to find whether "adjustments" to (i.e., provisions of) the electric security plan "resulted in excessive earnings." *Columbus S. Power* at ¶ 40. Moreover, the commission has defined "adjustments" in the first sentence of R.C. 4928.143(F) as "includ[ing] any change in rates when compared to the rates in the electric utility's preceding rate plan." *In*

*re Investigation into the Development of the Significantly Excessive Earnings Test*, Pub. Util. Comm. No. 09-786-EL-UNC, at 15 (June 30, 2010) ("SEET Test Case").

{¶ 27} There is no question that the DMR constituted a change in rates when compared to the rates in the electric utility's preceding rate plan. The commission's approval of the DMR authorized the FirstEnergy companies to collect an additional $168 million to $204 million in revenue in each of the first three years of the companies' fourth ESP. *See In re Application of Ohio Edison*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906, at ¶ 1, 6. Therefore, the DMR constitutes an "adjustment" under R.C. 4928.143(F) and the commission was required to include the DMR when determining whether the plan resulted in excessive earnings.

{¶ 28} Accordingly, we hold that the commission's action in this case— removing DMR revenue from the calculation used to determine whether the ESP resulted in excessive earnings—violated R.C. 4928.143(F).

### 3. *The court lacks jurisdiction over the alleged violation of R.C. 4903.09*

{¶ 29} The opinion concurring in judgment only in part and dissenting in part (hereafter, "concurring and dissenting opinion" or "dissent") concurs in the judgment reversing the commission's order but dissents from our determination that the commission must include the DMR revenue in the SEET calculation on remand. The dissent is based on the view that the commission violated R.C. 4903.09, which requires the commission's order to include the factual basis and reasoning that the commission relied on in reaching its decision. *Tongren*, 85 Ohio St.3d at 89-90, 706 N.E.2d 1255. According to the dissent, the commission violated this provision when it "failed to explain the statutory and evidentiary bases for its decision to exclude the [DMR] revenue from the [SEET] required by R.C. 4928.143(F)." Concurring and dissenting opinion at ¶ 88. As a result, the dissent contends, "[i]t is premature to reach the merits of whether R.C. 4928.143(F) permitted the commission to exclude the [DMR] revenue from the [SEET]" and to order that the commission include the revenue in a new SEET proceeding on

remand. *Id.* at ¶ 114. Instead, the dissent opines that precedent requires us to "return this matter to the commission to explain and support its decision" to exclude the DMR from the SEET. *Id.* at ¶ 88.

**{¶ 30}** The dissent overlooks the fact that OCC did not allege a violation of R.C. 4903.09 in an application for rehearing before the commission. And that fact is crucial because it means we lack jurisdiction over this issue on appeal. *See* R.C. 4903.10; *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, 18 N.E.3d 1157, ¶ 71; *see also In re Application of Am. Transm. Sys., Inc.*, 125 Ohio St.3d 333, 2010-Ohio-1841, 928 N.E.2d 427, ¶ 27 fn. 1; *In re Application of Columbus S. Power Co.*, 128 Ohio St.3d 512, 2011-Ohio-1788, 947 N.E.2d 655, ¶ 71.

**{¶ 31}** Moreover, in concluding that the commission violated R.C. 4903.09, the dissent states that "the commission's finding that Ohio Edison would face 'an unnecessary element of risk' if [DMR] revenue were included in the earnings test *lacks any citation to record evidence* and is therefore an insufficient rationale." (Emphasis added.) Concurring and dissenting opinion at ¶ 96. But the commission did refer to evidence submitted by Ohio Edison in making this finding. Therefore, although the commission's decision lacked a sufficient rationale, it is not accurate to hold that the commission's risk finding lacked record evidence. In the end, it would be improper for us to dispose of this appeal on an alleged violation of R.C. 4903.09.

### B. The counterarguments

**{¶ 32}** Ohio Edison and the commission both argue that the plain language of R.C. 4928.143(F) supports the commission's decision to remove the DMR revenue from the SEET. They claim that the statute authorizes the commission to make appropriate "adjustments" to the electric utility's earned return on common equity in conducting the SEET, although their claims differ on the type of adjustment the commission made when it removed the DMR revenue. As explained

below, because the commission's orders do not mention this justification for the removal of the DMR revenue, we reject the counterarguments.

### 1. The commission's counterarguments

{¶ 33} The commission claims that it has discretion under R.C. 4928.143(F) to make certain adjustments in conducting the SEET. Under R.C. 4928.143(F), whether an electric security plan "resulted in excessive earnings" is

> measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk, *with such adjustments for capital structure as may be appropriate. Consideration also shall be given to the capital requirements of future committed investments in this state*.

(Emphasis added.) According to the commission, in removing the DMR from the SEET, the commission merely made "an adjustment for improving the company's capital structure appropriately to support the large commitments needed for grid modernization." And because the adjustment to Ohio Edison's capital structure under R.C. 4928.143(F) is a matter for the commission's expertise, the commission asserts that we should defer to its determination.

{¶ 34} The commission, however, never said it was making an adjustment for capital structure when it removed the DMR revenue. As noted, the commission cited no language in R.C. 4928.143(F) that would authorize it to remove the DMR revenue from the SEET calculation. If the commission had determined that removing this revenue was an appropriate adjustment to Ohio Edison's capital structure under the SEET, it should have said so.

{¶ 35} Nor did Ohio Edison argue that the removal of DMR revenue was justified as an adjustment to its capital structure. In fact, in the ESP case, it specifically argued that "to the extent that the Commission determines that Rider DMR revenue should be *included* in the SEET calculation, the Commission would need to make appropriate adjustments to the Companies' capital structure." (Emphasis added.)

{¶ 36} While we generally defer to the commission in matters involving its expertise, we cannot defer to a determination the commission never made. *See Rich's Dept. Stores, Inc. v. Levin*, 125 Ohio St.3d 15, 2010-Ohio-957, 925 N.E.2d 951, ¶ 23-24 (although we acknowledged that the Board of Tax Appeals' "factual findings merit utmost deference when supported by the record," we declined the taxpayer's request that we "defer to a finding that the [Board of Tax Appeals] did not make"). For these reasons, our practice is not to uphold a commission's discretionary decision when the commission offers a different justification on appeal than it provided in its order. *Duke Energy* at ¶ 23-26. We therefore reject the commission's attempt to recast its decision.

### 2. *Ohio Edison's counterarguments*

#### a. The commission did not adopt Ohio Edison's comparable-risk argument

{¶ 37} Ohio Edison argues that the plain language of R.C. 4928.143(F) supports the commission's decision to remove DMR revenue from the SEET's calculation of the earned return on common equity. R.C. 4928.143(F) requires the commission to compare the electric utility's return on common equity with the returns of "publicly traded companies, including utilities, *that face comparable business and financial risk*." (Emphasis added.) The commission found that Ohio Edison would face an "an unnecessary element of risk" if the DMR revenue were included. ESP Fifth Entry on Rehearing, 2016 Ohio PUC LEXIS 920, at ¶ 212. According to Ohio Edison, because no other company has a mechanism like the

DMR, the commission found that removal of its revenue was necessary for the commission to conduct a valid comparison based on "comparable risk." The record from the ESP case, however, does not support this argument.

{¶ 38} Ohio Edison did argue in the ESP case that DMR revenue should be excluded to allow the commission to conduct a valid comparison of the earned returns on equity. But Ohio Edison's witness never mentioned risk to the company in making the valid-comparison argument to the commission. Rather, Ohio Edison's risk claim was made in relation to having to refund DMR revenue. The commission found this argument persuasive. However, in the end, the commission never mentioned the comparable-risk clause in R.C. 4928.143(F) as its reason for excluding the DMR revenue, so we reject this argument.

b.  The commission did not exclude DMR revenue based on
similar exclusions in the SEET Test Case

{¶ 39} Under R.C. 4928.143(F), the commission must determine the electric utility's "earned return on common equity." In the SEET Test Case, the commission defined "earned return" as "the electric utility's profits after deduction of all expenses, including taxes, minority interest, and preferred dividends, paid or accumulated, and *excluding any non-recurring, special, and extraordinary items*." (Emphasis added.) *Id.*, Pub. Util. Comm. No. 09-786-EL-UNC, at 18 (June 30, 2010).

{¶ 40} Ohio Edison argues that the commission "relied on testimonial evidence" to properly remove DMR revenue when it calculated the earned return based on this definition. Specifically, Ohio Edison claims that the commission excluded the revenue because the DMR (1) constituted an "extraordinary item" and (2) was "associated with an[] additional liability or write-off of regulatory assets due to implementing" the fourth ESP.

{¶ 41} Ohio Edison made this argument in the ESP case, but the commission did not rely on it when it excluded the DMR revenue. Even though

the commission ruled in Ohio Edison's favor, the company continued to argue that it was proper to exclude the revenue on these additional grounds. ESP Eighth Entry on Rehearing, 2017 OHIO PUC LEXIS 719, at ¶ 78.

**{¶ 42}** The commission resolved Ohio Edison's argument in the ESP Eighth Entry on Rehearing, as follows:

> The Commission affirms our ruling that the revenue collected under Rider DMR should be excluded from SEET for the initial three-year period. *At the time we issued the Fifth Entry on Rehearing, we found the arguments made by the Companies to be persuasive and continue to do so today*, to the extent such arguments are relating to the initial three-year period of Rider DMR.

(Emphasis added.) *Id.* at ¶ 81.

**{¶ 43}** Ohio Edison cites this paragraph as proof that the commission adopted these additional grounds to support its decision to remove the revenue. For the following reasons, we decline to read this decision in the manner that Ohio Edison suggests.

**{¶ 44}** First, the commission made no express or implicit finding that the DMR constituted an "extraordinary item" or an "additional liability or write-off of [a] regulatory asset[]." Although the commission found Ohio Edison's arguments "persuasive," the commission never identified which arguments were persuasive. And the fact remains that the commission adopted only Ohio Edison's increased-risk argument in support of removing DMR revenue. *See* ESP Fifth Entry on Rehearing, 2016 Ohio PUC LEXIS 920, at ¶ 212; ESP Eighth Entry on Rehearing, 2017 OHIO PUC LEXIS 719, at ¶ 81.

**{¶ 45}** Second, Ohio Edison ignores that its SEET application did not mention that the DMR was being excluded as an "extraordinary item." Ohio Edison

likewise overlooks that the SEET application expressly stated that there were "no adjustments * * * associated with any additional liability or write-off of regulatory assets."

{¶ 46} The dissent faults the lead opinion for discarding Ohio Edison's arguments construing R.C. 4928.143(F). As the dissent sees it, this court "must address all arguments regarding what the statute means," even when the commission declined to address an argument that was raised below and even when a party raises an argument for the first time on appeal. Concurring and dissenting opinion at ¶ 110.

{¶ 47} We have previously explained that our practice is not to uphold a commission's decision based on a justification asserted by a party on appeal that is different from the justification the commission provided in its order. *See In re Application of Duke Energy Ohio, Inc.*, 148 Ohio St.3d 510, 2016-Ohio-7535, 71 N.E.3d 997, ¶ 23-26. Because the dissent cites no authority that undermines our adherence to that rule in this appeal, we see no need to reconsider that rule here.

{¶ 48} Likewise, we are not required to consider arguments on appeal that could have been but were not raised in earlier administrative proceedings. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 279, 617 N.E.2d 1075 (1993); *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 30. Quite simply, the failure to present an argument to the commission constitutes a waiver of that argument on appeal. *Parma v. Pub. Util. Comm.*, 86 Ohio St.3d 144, 148, 712 N.E.2d 724 (1999); *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 127 Ohio St.3d 524, 2010-Ohio-6239, 941 N.E.2d 757, ¶ 18. And although there may be exceptions, as a matter of basic fairness, we do not accept objections when a party has deprived the commission of an opportunity to correct the error, *Parma* at 148; *Ohio Consumers' Counsel* at ¶ 18*; In re Application of Columbus S. Power Co.*, 129 Ohio St.3d 271, 2011-Ohio-2638, 951 N.E.2d 751, ¶ 19.

{¶ 49} Finally, the dissent contends, "[C]ontrary to the lead opinion, Ohio Edison's arguments draw upon the plain meaning of R.C. 4928.143(F), and therefore, its arguments have merit." Concurring and dissenting opinion at ¶ 89. According to the dissent, the DMR "affects Ohio Edison's financial risk, its capital structure, and the capital requirements for committed investments in this state, and R.C. 4928.143(F) affords the commission discretion to adjust these components as may be appropriate." Concurring and dissenting opinion at ¶ 113.

{¶ 50} Ohio Edison, however, did not argue in this appeal that the DMR revenue should be excluded from the SEET either as an adjustment for the company's capital structure or due to its capital requirements for future committed investments. Hence, it is improper for us to consider these arguments at this time. As for whether the DMR revenue may be excluded from the SEET based on increased business and financial risk to the utility, we note that the dissent's argument is based on its erroneous claim that the commission found that including the DMR revenue in the SEET increased Ohio Edison's *business and financial risk*. The dissent concedes that the commission made no such finding by observing that the commission's risk finding was "presumably" referring to the company's business and financial risk. Concurring and dissenting opinion at ¶ 111.

c. Ohio Edison's lack-of-prejudice

and lack-of-jurisdiction-to-remand claims

{¶ 51} Ohio Edison asserts that we should dismiss this appeal because OCC has not demonstrated prejudice stemming from the commission's SEET order. Ohio Edison also contends that we lack jurisdiction to remand this case for a new SEET proceeding. We reject both arguments.

*i. OCC has demonstrated prejudice*

{¶ 52} We "will not reverse an order of the commission upon an assignment of error without a showing of concomitant harm or prejudice." *Ohio Commt. of Cent. Station Elec. Protection Assn. v. Pub. Util. Comm.*, 50 Ohio St.2d 169, 174,

364 N.E.2d 3 (1977). Ohio Edison contends that OCC has not shown harm to ratepayers caused by the commission's decision to exclude DMR revenue from the company's return on equity. According to Ohio Edison, rather than citing evidence that establishes harm, OCC merely speculates that consumers might be entitled to a refund.

{¶ 53} Contrary to Ohio Edison's claim, OCC was not required to show that ratepayers were entitled to a refund to establish harm. R.C. 4928.143(F) protects ratepayers from having to pay significantly excessive rates to the electric utility. But ratepayers are protected only if the commission conducts a valid SEET. OCC cannot show that a refund is warranted until a new SEET proceeding is conducted, yet Ohio Edison would deny OCC that opportunity. OCC's harm is that Ohio Edison was not required to include the DMR revenue in its earnings when it asserted that the ESP earnings were not significantly excessive. *Compare Columbus S. Power*, 134 Ohio St.3d 392, 2012-Ohio-5690, 983 N.E.2d 276, at ¶ 46 (finding that the appellant failed to show prejudice when it neither explained nor provided evidence of which adjustments the commission should have made under the SEET).

*ii. This court has jurisdiction to remand*
*this case for new SEET proceeding*

{¶ 54} Ohio Edison also alleges that we lack jurisdiction to remand this case to the commission for a new SEET proceeding.

{¶ 55} In the SEET proceeding, the commission found that Ohio Edison's calculation of 12.22 percent for the return on equity should be used for the 2017 SEET analysis. The commission rejected OCC's calculation of the company's return on equity of 17.39 percent because OCC had included the DMR revenue in this calculation.

{¶ 56} In addition to determining Ohio Edison's return on equity, the commission needed to determine an appropriate SEET threshold, which is the point

above which earnings are considered significantly excessive. The commission considered three different methodologies: one proposed by the commission's staff that resulted in a return on equity threshold of 17.22 percent, a second proposed by Ohio Edison resulting in a threshold of 19.20 percent, and OCC's methodology, which resulted in a proposed threshold of 14.91 percent.

{¶ 57} The commission, however, did not settle on a specific SEET threshold. Instead, the commission found that the methodologies of Ohio Edison and the commission's staff were appropriate.

{¶ 58} Against this backdrop, Ohio Edison maintains that the only issue OCC preserved for appeal was a challenge to the commission's calculation of the company's return on equity. According to Ohio Edison, even if OCC were to prevail on its challenge to the return-on-equity calculation, OCC's calculated return on equity of "17.39 percent is substantially below the 19.20 percent SEET threshold approved by the Commission." Ohio Edison claims that OCC never challenged the 19.20 percent SEET threshold that was approved by the commission either on rehearing at the commission or on appeal. As a result, Ohio Edison argues, OCC waived the issue whether Ohio Edison had significantly excessive earnings for 2017 and this court lacks jurisdiction to consider the issue.

{¶ 59} OCC responds that the commission never established the SEET threshold in the case below. Therefore, OCC asserts, the court has jurisdiction to remand the cause to the commission with instructions that it conduct the SEET with the DMR revenue included and establish the SEET threshold. We agree with OCC.

{¶ 60} Although the commission found that the methodologies of Ohio Edison and the commission's staff were "appropriate," the commission did not determine a specific SEET threshold. Instead, the commission found that Ohio Edison's earnings were not significantly excessive, because the "properly calculated" return on equity for Ohio Edison of 12.22 percent (which excluded DMR revenue) fell well below *all* of the recommended thresholds. Thus, while

20

Ohio Edison is correct that OCC's calculated return on equity of 17.39 percent (which included DMR revenue) was below Ohio Edison's proposed SEET threshold (19.20 percent), it did *not* fall below the proposed SEET thresholds of either the commission's staff (17.22 percent) or OCC (14.91 percent).

{¶ 61} In sum, the record does not support Ohio Edison's claim that the commission approved a 19.20 percent SEET threshold.  Therefore, we reject Ohio Edison's claim that we lack jurisdiction to remand this case for a new SEET proceeding.

d. OCC did not waive its challenge to the approved stipulation

{¶ 62} Ohio Edison's final argument is that OCC waived any challenge to the commission's approval of the stipulation entered into by Ohio Edison, the commission's staff, and Ohio Energy Group in the SEET proceeding.  The stipulation purported to resolve all outstanding issues in the SEET proceeding and recommended that the commission find that Ohio Edison did not have significantly excessive earnings for 2017.  After review, the commission modified and approved the joint stipulation.

{¶ 63} Ohio Edison claims that because OCC did not argue on appeal that the stipulation did not meet the three criteria necessary for approval of a stipulation, the commission's approval of the stipulation must stand.  *See Constellation NewEnergy*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, at ¶ 8 (setting forth the three criteria).  We disagree.

{¶ 64} A stipulation presented to the commission is entitled to the force of law only if it is approved by a commission order.  *Consumers' Counsel v. Pub. Util. Comm.*, 114 Ohio St.3d 340, 2007-Ohio-4276, 872 N.E.2d 269, ¶ 16.  OCC argues on appeal that the commission's orders are unlawful and unreasonable because it removed DMR revenue in violation of R.C. 4928.143(F).  OCC did not need to couch its appeal as a challenge to the commission's application of the three-part test, because its challenge to the commission's orders directly implicates the

commission's approval of the stipulation. Therefore, we reject Ohio Edison's waiver argument.

### IV. CONCLUSION

**{¶ 65}** For the foregoing reasons, we reverse the orders on appeal and remand the case to the commission for further review consistent with this opinion. On remand, we instruct the commission to conduct a new SEET proceeding in which it includes the DMR revenue in the analysis, determines the SEET threshold, considers whether any adjustments under R.C. 4928.143(F) are appropriate, and makes any other determinations that are necessary to resolve this matter.

Orders reversed

and cause remanded.

O'CONNOR, C.J., and DONNELLY, J., concur.

DEWINE, J., concurs in judgment only, with an opinion.

KENNEDY, J., concurs in judgment only in part and dissents in part, with an opinion joined by FRENCH, J.

FISCHER, J., dissents.

_____

**DEWINE, J., concurring in judgment only.**

**{¶ 66}** I agree with the majority's holding that the Public Utilities Commission of Ohio could not exclude revenue from Ohio Edison Company's "Distribution Modernization Rider" ("DMR")[4] in its annual earnings review of Ohio Edison's electric security plan. The lead opinion reasons, correctly, that the statute laying out the framework by which the commission determines whether an electric security plan resulted in excessive earnings does not authorize the

_____

4. The DMR is a "temporary, additional charge * * * separate from the basic monthly rates" that the commission allowed as part of Ohio Edison's electric security plan in the hope that the revenue from the DMR would serve as an incentive for Ohio Edison to modernize its utility distribution system. *See In re Application of Ohio Edison Co.*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906, ¶ 1, fn. 1.

commission's actions in this case. Lead opinion at ¶ 20. I cannot join the lead opinion, though, because of my concerns with the deference it gives to the commission's interpretation of the law.

{¶ 67} As a creation of statute, the commission cannot act beyond the powers given to it by the General Assembly. *Discount Cellular, Inc. v. Pub. Util. Comm.*, 122 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 51. R.C. 4928.143(F) requires the commission to consider whether provisions in an electric security plan

> resulted in excessive earnings as measured by whether the earned return on common equity of the electric distribution utility is significantly in excess of the return on common equity that was earned during the same period by publicly traded companies, including utilities, that face comparable business and financial risk, with such adjustments for capital structure as may be appropriate. * * * Consideration also shall be given to the capital requirements of future committed investments in this state.

{¶ 68} The statute requires the commission to perform a two-part task. First, the commission must select companies that "face comparable business and financial risk" to the utility and determine the return on equity of the utility and the comparable companies. When it comes to this determination, the statute permits only one type of adjustment—"adjustments for capital structure as may be appropriate." Once the commission has completed this step, then it must compare the return on equity of the utility and the comparable companies and determine whether the utility's return on equity is substantially in excess of the comparable companies. This step is less circumscribed: the statute does not define "significantly in excess," and in making its determination, the commission is also

to give consideration to "the capital requirements of future committed investments in this state."

**{¶ 69}** By its plain terms, the statute does not allow for the commission's adjustment to remove DMR revenues from the utility's return on equity. It is not an "adjustment[] for capital structure" under any plausible understanding of the phrase. Thus, the plain text of the statute compels us to conclude that the commission lacked statutory authority for its actions. *See In re Application of Ohio Edison Co.*, 158 Ohio St.3d 27, 2019-Ohio-4196, 139 N.E.3d 875, ¶ 17 ("we decline to assume that the General Assembly implicitly granted authority to the commission * * * without any clear indication in the statutory language to that effect").

**{¶ 70}** That should be where the court's analysis begins and ends. But the lead opinion takes a different path. First, the lead opinion announces that because R.C. 4928.143(F) is a rate-of-return statute, it will defer to the agency's interpretation as long as its interpretation is reasonable. Lead opinion at ¶ 15. It then goes on to analyze whether the commission's interpretation of the statute was reasonable. Even under this highly deferential standard, the lead opinion concludes that the commission's interpretation was unreasonable and so ultimately reaches the right result. But I worry that the analytical path it uses in this case further muddles this court's caselaw on administrative deference.

**{¶ 71}** As I have written before, I am skeptical of deferring to an agency's statutory interpretation. Such deference blurs the separation-of-powers principles that underpin our constitutional order. *See, e.g., State ex rel. McCann v. Delaware Cty Bd. of Elections*, 155 Ohio St.3d 14, 2018-Ohio-3342, 118 N.E.3d 224, ¶ 30-31 (DeWine, J., concurring in judgment only). Deference to an agency's interpretation of a statute forces the judiciary to abandon the exercise of its independent judgment in favor of an agency's construction. *Michigan v. Environmental Protection Agency*, 576 U.S. 743, 761, 135 S.Ct. 2699, 192 L.Ed.2d

674 (2015) (Thomas, J. concurring), citing *Natl. Cable & Telecommunications Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 983, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). But even without a wholesale reexamination of our deference doctrine, there are problems with the lead opinion's analysis that should not go unmentioned.

{¶ 72} I have two fundamental concerns. First, the lead opinion's formulation of the deference doctrine requires that we defer to an agency's reasonable interpretation of a statute, even if we have not first concluded that the statute is ambiguous. Second, in analyzing the statute at issue, the lead opinion fails to distinguish between matters over which the legislature has delegated authority to the commission and matters of purely legal interpretation.

### *No Deference Is Owed to an Agency's Interpretation of an Unambiguous Statute*

{¶ 73} The most troubling aspect of the lead opinion is its assertion that we should defer to an agency's interpretation of a statute if it is reasonable. *See* lead opinion at ¶ 15 ("we defer to the commission's interpretation of R.C. 4928.143(F) only if it is reasonable"). Even under familiar deference doctrines this formulation misses an important first step. Before a court even considers deferring to an agency's interpretation, it must first find that the statute is genuinely ambiguous.

{¶ 74} The Ohio Revised Code makes this requirement explicit. R.C. 1.49 sets forth six items a court "may consider among other matters" "[i]f a statute is ambiguous." These include things like "the object sought to be attained," the circumstances of enactment, the common law, and "[t]he administrative construction of the statute." Thus, by the plain provisions of the Ohio Revised Code, a finding of ambiguity must come before a court is even permitted to consider an agency's interpretation. And even then, we need not defer to that construction, we need only "consider" it.

{¶ 75} The requirement that a finding of ambiguity must come before a court affords deference has some parallels to the practice in the federal system.

Under the familiar (though oft-criticized) standard first articulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), a court will sometimes defer to an agency's interpretation of an ambiguous statute. As I've noted before, I'm no fan of the *Chevron* doctrine. *See State ex rel. McCann*, 155 Ohio St.3d 14, 2018-Ohio-3342, 118 N.E.3d 224, at ¶ 30-34. But it is worth pointing out that even the *Chevron* doctrine, as it is currently understood, is far less deferential to agency decision-making than the formulation employed by the lead opinion today.

**{¶ 76}** For *Chevron* to apply, a court must find that Congress has delegated an agency the authority to promulgate rules with the force of law *and* "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-227, 121 S.Ct 2164, 150 L.Ed.2d 292 (2001). If a court finds that Congress has delegated such authority to the agency, it must then engage in a two-step process.

**{¶ 77}** First, the court must determine whether the statute is ambiguous. "[D]eference is not due unless a 'court, employing traditional tools of statutory construction,' is left with an unresolved ambiguity." *Epic Sys. Corp. v. Lewis*, ___ U.S. ___, 138 S.Ct. 1612, 1630, 200 L.Ed.2d 889 (2018), quoting *Chevron* at 843, fn. 9. Only when the statute has been found to be genuinely ambiguous does the court move to the second step of the process and determine whether the agency's interpretation is reasonable. *Chevron* at 843.

**{¶ 78}** The lead opinion's confusion today is somewhat understandable. This court's precedent is far from consistent when it comes to the requirement that a statute be found ambiguous before consideration may be given to an agency's construction. At times, we have followed the *Chevron* model and first asked whether the statute was ambiguous. *See, e.g.*, *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 29; *Lang v. Dir., Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-

Ohio-5366, 982 N.E.2d 636, ¶ 14-15 (concluding that because the federal statute at issue was ambiguous, the court would defer to the Ohio agency's interpretation of the statute). More often, though, we have simply said that we will defer to an agency's interpretation as long as it is reasonable. *See, e.g., State ex rel. Lucas Cty. Republican Party Executive Commt. v. Brunner*, 125 Ohio St.3d 427, 2010-Ohio-1873, 928 N.E.2d 1072, ¶ 23; *In re Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, 8 N.E.3d 863, ¶ 29.

{¶ 79} The lead opinion continues on this wrong path, eschewing the limitations imposed by R.C. 1.49 (and on federal courts by *Chevron*). It never asks if the legislature delegated to the commission the claimed-authority to interpret R.C. 4928.143(F). And it never asks whether the statute is truly ambiguous. It asks only whether the commission's interpretation is reasonable.

{¶ 80} "The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts inferior to the supreme court as may from time to time be established by law." Ohio Constitution, Article IV, Section 1. Central to the judicial power is the duty to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803). When we defer to an agency's interpretation of a statute—asking only whether it is reasonable—we abdicate our constitutional responsibility. At the very least, we ought to ensure that a statute is truly ambiguous, before we even consider giving weight to an agency's interpretation.

### There Is No Reason to Defer to the Commission's
### Legal Construction of "Rate of Return" Statutes

{¶ 81} The lead opinion's willingness to skip the ambiguity step is not the only problem with its analysis. Also troubling is its assumption that deference is owed to any agency determination of rate-of-return matters, without distinguishing between the agency's construction of statutory terms and its performance of a task delegated to it by the legislature.

27

{¶ 82} The lead opinion makes the blanket statement that " 'One area in which this court has consistently deferred to the expertise of the commission is in determining rate-of-return matters.' " Lead opinion at ¶ 14, quoting *In re Comm. Rev. of Capacity Charges of Ohio Power Co.*, 147 Ohio St.3d 59, 2016-Ohio-1607, 60 N.E.3d 1221, ¶ 41. It then says that because R.C. 4928.143(F) is essentially a rate-of-return statute, it will defer to the commission's interpretation as long as it is reasonable.

{¶ 83} The problem, though, is that in making this broad statement, and in its subsequent analysis, the lead opinion fails to distinguish between matters over which the legislature has delegated authority to the commission (such as whether a given rate of return is appropriate) and general matters involving the interpretation of plain statutory terms. As to the former, deference may be appropriate; but it is not for the latter.

{¶ 84} To see why, let's return to the statute. Under R.C. 4928.143(F), "the commission shall consider" whether provisions in an electric security plan resulted in returns that were "significantly in excess of the return on common equity" of comparable companies. The statute does not define "significantly in excess" and thus could be read to delegate authority to the commission to make this determination. Hence, if the question was whether a 5, 10, or 15 percent return differential was "significantly in excess," it might be appropriate to defer to the commission's judgment.

{¶ 85} But that is not the question here. The question is whether the DMR revenue could be excluded from the excessive-earnings calculation. To answer that question, one need only determine whether the removal of DMR revenues is an "adjustment[] for capital structure," R.C. 4928.143(F). The relevant considerations are the nature of DMR revenues and the meaning of "capital structure." The question is simply one of legal interpretation of commonly used terms, and it is one that should be made by a court without deference to the commission. *See In re*

28

*Application of Ohio Edison Co.*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906, at ¶ 62 (DeWine, J., concurring in judgment only); *In re Application of Black Fork Wind Energy, L.L.C.*, 156 Ohio St.3d 181, 2018-Ohio-5206, 124 N.E.3d 787, ¶ 43 (Kennedy, J., concurring).

### It Is Time to Revisit Our Caselaw on Administrative Deference

{¶ 86} The lead opinion is simply more evidence that we need to revisit our caselaw on administrative deference. This court's caselaw is far from consistent on the topic, is at odds with basic notions of separation of powers, and fails even to comply with our statutory charge in R.C. 1.49. In recent years, at least seven state supreme courts have revisited and rejected their doctrines of administrative deference. *See In re Complaint of Rovas Against SBC Michigan*, 482 Mich. 90, 111, 754 N.W.2d 259 (2008) (declining to adopt *Chevron* for review of state administrative agencies' statutory interpretation on, among others, separation-of-powers grounds); *Douglas v. Ad Astra Information Sys., L.L.C.*, 296 Kan. 552, 559, 293 P.3d 723 (2013) (stating that judicial deference to agency construction of statutes "has been abandoned, abrogated, disallowed, disapproved, ousted, overruled, and permanently relegated to the history books"); *Hughes Gen. Contrs., Inc. v. Utah Labor Comm.*, 2014 UT 3, 322 P.3d 712, ¶ 25 (rejecting *Chevron*-style deference); *Ellis-Hall Consultants v. Pub. Serv. Comm. of Utah*, 2016 UT 34, 379 P.3d 1270, ¶ 28 (repudiating its decisions requiring deference to an agency's interpretation of its own regulations); *Tetra Tech EC, Inc. v. Wisconsin Dept. of Revenue*, 382 Wis.2d 496, 2018 WI 75, 914 N.W.2d 21, ¶ 3, 82-84, fn. 3 (ending its practice of deferring to agency conclusions of law); *King v. Mississippi Military Dept.*, 245 So.3d 404, 408 (Miss.2018) (abandoning the "old standard of review giving deference to agency interpretations of statutes"); *Delcon Partners, L.L.C. v. Wyoming Dept. of Revenue*, 2019 WY 106, 450 P.3d 682, ¶ 7 (stating that agency interpretations and applications of the law are not afforded any deference); *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 135, at 5, 597 S.W.3d 613 (clarifying that

because it is the province and duty of a court to determine a statute's meaning, agency interpretations will not be given deference). And at least three states have significantly curtailed administrative deference through legislation or constitutional amendment. Florida Constitution, Article V, Section 21; Ariz.Rev.Stat.Ann. 12-910; Wis.Stat.Ann. 227.10. It is past time for this court to take up the matter.

### *Conclusion*

{¶ 87} The lead opinion reaches the right result. But because I disagree with the deference it would accord to the commission's interpretation of the law, I concur only in its judgment.

_____

**KENNEDY, J., concurring in judgment only in part and dissenting in part.**

{¶ 88} Because the Public Utilities Commission, appellee, failed to explain the statutory and evidentiary bases for its decision to exclude the Distribution Modernization Rider revenue from the significantly-excessive-earnings test required by R.C. 4928.143(F), I concur in the majority's judgment reversing the commission's decision. But rather than make the determination whether the commission must include the rider revenue in the earnings test, I would return this matter to the commission to explain and support its decision as required by our precedent.

{¶ 89} The lead opinion, however, would make that determination and discard many of Ohio Edison's statutory-construction arguments as not properly before the court. But our duty is to say what the law enacted by the General Assembly is, and we cannot ignore the true meaning of a statute simply because a party failed to assert it below or raised a statutory-construction argument for the first time in this court. In addition, a party who is not aggrieved by the commission's decision is not required to seek a rehearing or file a cross-appeal in order to preserve its arguments for upholding the decision. And contrary to the lead

opinion, Ohio Edison's arguments draw upon the plain meaning of R.C. 4928.143(F), and therefore, its arguments have merit.

{¶ 90} For the reasons that follow, I dissent from the portion of the majority's judgment ordering the commission to conduct a new proceeding in which it includes the Distribution Modernization Rider revenue in the earnings test.

### The Commission Is Required to Explain Its Decisions

{¶ 91} Article IV, Section 2(B)(2)(d) of the Ohio Constitution grants this court "[s]uch revisory jurisdiction of the proceedings of administrative officers or agencies as may be conferred by law." The General Assembly conferred such appellate power on this court through its enactment of R.C. 4903.13, which provides that "[a] final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable."

{¶ 92} To facilitate this review, R.C. 4903.09 directs the commission to provide "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." The statute " 'enable[s] this court to review the action of the commission without reading the voluminous records in Public Utilities Commission cases.' " (Brackets added.) *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87, 89, 706 N.E.2d 1255 (1999), quoting *Commercial Motor Freight, Inc. v. Pub. Util. Comm.*, 156 Ohio St. 360, 363, 102 N.E.2d 842 (1951). As the United States Supreme Court has remarked, it is not possible for this court "to review the law and the facts and intelligently decide that the findings of the Commission [are] supported by the evidence when the evidence * * * [is] unknown and unknowable." *Ohio Bell Tel. Co. v. Pub. Util. Comm. of Ohio*, 301 U.S. 292, 303, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).

{¶ 93} R.C. 4903.09 therefore requires the commission's orders to contain specific findings of fact and conclusions of law sufficient "to enable [this] court to

make its review as to lawfulness and reasonableness." *MCI Telecommunications Corp. v. Pub. Util. Comm.*, 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (1987). "In order to meet the requirements of R.C. 4903.09, * * * the [commission's] order must show, in sufficient detail, the facts in the record upon which the order is based, and the reasoning followed by the [commission] in reaching its conclusion." *Id.*

{¶ 94} This requirement is part and parcel of our standard of review: we will reverse a decision of the commission if it unlawful or unreasonable, and a decision that contravenes R.C. 4903.09 is necessarily unlawful and unreasonable. *See Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 163, 166, 666 N.E.2d 1372 (1996) ("A legion of cases establish that the commission abuses its discretion if it renders an opinion on an issue without record support"); *Ideal Transp. Co. v. Pub. Util. Comm.*, 42 Ohio St.2d 195, 199, 326 N.E.2d 861 (1975) (a commission order that fails to comply with the requirements of R.C. 4903.09 is unlawful).

{¶ 95} This court has therefore not hesitated to reverse commission decisions that fail to sufficiently develop the record or explain the supporting rationale. *In re Application of Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, 67 N.E.3d 734, ¶ 66; *In re Application of Ohio Power Co.*, 155 Ohio St.3d 326, 2018-Ohio-4698, 121 N.E.3d 320, ¶ 51.

{¶ 96} The lead opinion correctly points out that in excluding the Distribution Modernization Rider revenue from the significantly-excessive-earnings test, "the commission failed to even cite R.C. 4928.143(F), let alone explain how that provision allows the commission to exclude [Distribution Modernization Rider] revenue on this basis. * * * [T]he commission's failure to cite specific statutory authority for its actions is grounds for reversal." Lead opinion at ¶ 20. The lead opinion itself, then, would apply R.C. 4903.09 sub silentio by reversing on the basis that the commission failed to support its order with statutory authority. In addition, the commission's finding that Ohio Edison would

face "an unnecessary element of risk" if Distribution Modernization Rider revenue were included in the earnings test lacks any citation to record evidence and is therefore an insufficient rationale. *See Ohio Consumers' Counsel v. Pub. Util. Comm.*, 111 Ohio St.3d 300, 2006-Ohio-5789, 856 N.E.2d 213, ¶ 28, 36.

{¶ 97} Those determinations should end the analysis, and the court should reverse the commission's decision and return this matter to the commission to provide the evidentiary citations and statutory support needed for us to review its determination that the Distribution Modernization Rider revenue should be excluded from the significantly-excessive-earnings test.

## There Is No Jurisdictional Bar to Review

{¶ 98} The lead opinion asserts that this court's consideration of the commission's compliance with R.C. 4903.09 is jurisdictionally barred because appellant, Ohio Consumers' Counsel, failed to raise that issue in its application for rehearing. The lead opinion's assertion that we lack subject-matter jurisdiction to review errors not articulated in an application for rehearing, however, is contrary to the statutes establishing our power to review the commission's orders. R.C. 4903.13 empowers this court to review the orders of the commission, and it does not limit our subject-matter jurisdiction to the issues presented by the parties. Rather, we must reverse, vacate, or modify the commission's order if this court "is of the opinion that such order was unlawful or unreasonable." And any order that is incapable of review because the commission failed to comply with the requirements of R.C. 4903.09 is unlawful and unreasonable.

{¶ 99} Neither R.C. 4903.10, which states that "[n]o party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in the application" for rehearing, nor R.C. 4903.13, which requires the notice of appeal to "set[] forth the order appealed from and the errors complained of," limit this court's subject-matter jurisdiction to review the lawfulness and reasonableness of the commission's decision. These statutes may guide the *exercise* of our

jurisdiction in reviewing the commission's decision, and they justify this court's disregarding an argument not asserted on rehearing or specified in the notice of appeal, but nothing in either of these statutes says that this court is without power or lacks subject-matter jurisdiction to consider issues that have not been properly put before the court when the court is of the opinion that the commission's order is unlawful or unreasonable.

{¶ 100} I recognize that it has often been said, usually by rote repetition, that the appellant's failure to comply with R.C. 4903.10 or 4903.13 deprives this court of "jurisdiction" to consider an issue. *E.g.*, lead opinion at ¶ 30; *In re Complaint of Pilkington N. Am., Inc.*, 145 Ohio St.3d 125, 2015-Ohio-4797, 47 N.E.3d 786, ¶ 19; *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 127 Ohio St.3d 524, 2010-Ohio-6239, 941 N.E.2d 757, ¶ 21. However, we have noted:

> The general term "jurisdiction" can be used to connote several distinct concepts, including jurisdiction over the subject matter, jurisdiction over the person, and jurisdiction over a particular case. * * * The often unspecified use of this polysemic word can lead to confusion and has repeatedly required clarification as to which type of "jurisdiction" is applicable in various legal analyses.

*Bank of Am., N.A. v. Kuchta*, 141 Ohio St.3d 75, 2014-Ohio-4275, 21 N.E.3d 1040, ¶ 18.

{¶ 101} Our public-utilities cases have propagated the confusion we have so often sought to clarify between the *existence* of subject-matter jurisdiction and the *exercise* of that subject-matter jurisdiction.

{¶ 102} Subject-matter jurisdiction refers to the constitutional or statutory power of a court to adjudicate a particular class or type of case. *State v. Harper*,

___ Ohio St.3d ___, 2020-Ohio-2913, ___ N.E.3d___, ¶ 23; *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 11-12, 34. It "is determined without regard to the rights of the individual parties involved in a particular case." *Kuchta* at ¶ 19. Rather, the focus is on whether the forum itself is competent to hear the controversy. *State v. Harper* at ¶ 23.

{¶ 103} R.C. 4903.12 provides that "[n]o court other than the supreme court shall have power to review * * * any order made by the public utilities commission." This court is the proper forum for this appeal. Nothing in R.C. 4903.10 or 4903.13 purports to limit our *subject-matter* jurisdiction over an appeal from the commission, and to the extent that this court has held otherwise in prior cases, those cases are irreconcilable with the plain text of the statutes and must be overruled.

### The Significantly-Excessive-Earnings Test

{¶ 104} But rather than return this matter to the commission for it to clarify the factual and statutory support for its decision, the lead opinion would go on to decide whether R.C. 4928.143(F) permitted the commission to exclude revenue from the Distribution Modernization Rider from the earnings test. In doing that, the lead opinion necessarily construes R.C. 4928.143(F). At the same time, it rejects Ohio Edison's arguments about what the statute means, simply because those interpretations of R.C. 4928.143(F) were not addressed below.

{¶ 105} However, the meaning of a statute is a question of law that we review de novo. *See Bur. of Workers' Comp. v. Verlinger*, 153 Ohio St.3d 492, 2018-Ohio-1481, 108 N.E.3d 70, ¶ 6. Our role in the exercise of the judicial power granted to us by the Ohio Constitution is to interpret and apply the statute *as the General Assembly enacted it*. *See Slingluff v. Weaver*, 66 Ohio St. 621, 64 N.E. 574 (1902), paragraph two of the syllabus. The parties may espouse arguments regarding the meaning of a statute, but in the end, it is the courts that have the authority and the duty to "say what the law is," *Marbury v. Madison*, 5 U.S. 137,

177, 2 L.Ed. 60 (1803). This court abdicates that responsibility if it rejects out of hand an interpretation of a statute just because it is raised for the first time in this court.

{¶ 106} The lead opinion also rejects Ohio Edison's plain-language arguments because the commission's orders did not mention them as bases for the removal of the rider's revenue. However, Ohio Edison did not have to apply for a rehearing or file a cross-appeal in order to get these arguments before the court. Nor was Ohio Edison aggrieved by the commission's order—it obtained the relief sought in this regard—and it therefore was not required to apply for a rehearing or file a cross-appeal to preserve any argument. *See Internatl. Paper Co. v. Testa*, 150 Ohio St.3d 348, 2016-Ohio-7454, 81 N.E.3d 1225, ¶ 33 (explaining that a protective cross-appeal was not required when the appellee is not aggrieved by the board of tax appeals' ruling). R.C. 4903.10 bars a party from seeking "reversal, vacation, or modification" of an order issued by the commission on any ground not set forth in an application for rehearing. But this statute does not bar a party from seeking the *affirmance* of the commission's order for a reason not asserted on rehearing. Further, a notice of appeal may be filed by one seeking "reversal, vacation, or modification" of an order issued by the commission. R.C. 4903.13. Ohio Edison, however, asks this court to *affirm* the commission's order.

{¶ 107} The lead opinion relies on *In re Application of Duke Energy Ohio, Inc.*, 148 Ohio St.3d 510, 2016-Ohio-7535, 71 N.E.3d 997, ¶ 23-26, for the assertion that "our practice is not to uphold a commission's decision based on a justification asserted by a party on appeal that is different from the justification the commission provided in its order." Lead opinion at ¶ 47. However, the court in *Duke Energy Ohio* relied on R.C. 4903.09, which requires the commission to support its decision with findings and reasons to enable an effective appellate review, in declining to review a justification different from that which was included

in the commission's order. *Id*. at ¶ 24. Yet here, the lead opinion expressly would not reverse and remand the commission's order as violating R.C. 4903.09.

{¶ 108} The lead opinion therefore disregards Ohio Edison's arguments explaining why the commission's exclusion of the Distribution Modernization Rider revenue from the significantly-excessive-earnings test was lawful and reasonable. At the same time, it would not remand this matter to the commission to address those arguments in a written opinion and instead would decide that the rider's revenue must be included in the test. That is, the justices joining the lead opinion and the justice concurring in judgment only take an action affecting Ohio Edison's property interests without any tribunal having ever fully addressed its arguments in response.

{¶ 109} Nothing in R.C. 4903.09 precludes this court from upholding the commission's order on grounds other than those the commission provided. After all, R.C. 4903.13 empowers us to reverse, vacate, or modify the commission's final orders, and it does not limit our review of the final order to simply agreeing or disagreeing with the justifications that the commission gave in support of that order. If the commission's ultimate order is lawful and reasonable, we do not have the power to reverse it.

{¶ 110} Therefore, since the court decides to consider the merits of whether the commission's decision to exclude the Distribution Modernization Rider revenue from the significantly-excessive-earnings test is authorized by the statute, it must address all arguments regarding what the statute means.

{¶ 111} As Ohio Edison points out, R.C. 4928.143(F) directs the commission in conducting the significantly-excessive-earrings test to base its comparisons on "publicly traded companies, including utilities, that face comparable business and financial risk," make "adjustments for capital structure as may be appropriate," and consider "the capital requirements of future committed investments in this state." The commission found that including the Distribution

Modernization Rider revenue in the earnings test increased the risk to the companies, and the only relevant risk to the companies under R.C. 4928.143(F) is business and financial risk. As a creature of statute, the commission had no authority to consider any other type of "risk" than that provided by the statute, and the only risk mentioned in the statute is the business and financial risk to the companies. *See In re Application of Ohio Edison Co.*, 158 Ohio St.3d 27, 2019-Ohio-4196, 139 N.E.3d 875, ¶ 17 (the commission has no authority to exceed its statutory powers).

{¶ 112} And the Distribution Modernization Rider "was designed to provide credit support for the FirstEnergy Corporation—through the companies— so it could borrow capital on more reasonable terms in order to support its grid-modernization initiatives." *In re Ohio Edison Co.*, 157 Ohio St.3d 73, 2019-Ohio-2401, 131 N.E.3d 906, ¶ 18 (lead opinion). The rider therefore related to Ohio Edison's capital structure, which includes the amount of and interest rate on its debt, as well as the cost of capital. *See* R.C. 4909.155. Lastly, the rider has helped make it possible for Ohio Edison to commit to a grid-modernization plan that will require a capital investment of hundreds of millions of dollars. *See In re Filing by Ohio Edison Co., Cleveland Elec. Illum. Co., & Toledo Edison Co. of a Grid Modernization Business Plan*, Pub. Util. Comm. No. 16-481-EL-UNC (Opinion and Order) at ¶ 111-112, 119 (July 17, 2019).

{¶ 113} The Distribution Modernization Rider therefore affects Ohio Edison's financial risk, its capital structure, and the capital requirements for committed investments in this state, and R.C. 4928.143(F) affords the commission discretion to adjust these components as may be appropriate.

## Conclusion

{¶ 114} It is premature to reach the merits of whether R.C. 4928.143(F) permitted the commission to exclude the Distribution Modernization Rider revenue from the significantly-excessive-earnings test. The commission has failed in its

duty to sufficiently explain its reasons and support its decision with citations to the evidence and statutory authority, and that is reversible error. But the majority goes too far in requiring the commission to include the rider's revenue in the earnings test. I would return this matter to the commission to explain and support its decision and save review of the merits for another day.

FRENCH, J., concurs in the foregoing opinion.

————————————

Bruce Weston, Ohio Consumers' Counsel, and William Michael, Angela D. O'Brien, and Maureen R. Willis, Assistant Consumers' Counsel, for appellant.

Dave A. Yost, Attorney General, and John Jones and Thomas W. McNamee, Assistant Attorneys General, for appellee.

Calfee, Halter & Griswold, L.L.P., James F. Lang, and Kari D. Hehmeyer; and FirstEnergy Service Company and Robert M. Endris, for intervening appellee.

————————————